**Edith P. GOODWIN, Plaintiff,**

v.

**HARTFORD LIFE INSURANCE COMPANY, Defendant.**

**Civ. A. No. 71–1070.**

United States District Court,
W. D. Pennsylvania.

Jan. 8, 1973.

Stephen J. Laidhold, Pittsburgh, Pa., for plaintiff.

Edward Springer, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

McCUNE, District Judge.

The plaintiff, the widow of Robert P. Goodwin, claims the proceeds of a life insurance policy which allegedly covered her deceased husband, Robert P. Goodwin, who died on November 28, 1970. The policy in question was a Group Insurance Policy, No. GL–9067, originally dated January 4, 1962, issued to cover the employees of the Ever-Soft Company of Pennsylvania, Inc. (herein "Ever-Soft"). The Pennsylvania law governs.

The issues are numerous as will be observed later on. The first issue is whether decedent was an eligible employee of Ever-Soft at the time of his death. If he was, the proceeds of the policy amount to $25,000.00 and if he was an eligible employee, the other issues became moot.

The plaintiff contends, however, that even though decedent was not eligible at his death, he had once been eligible and had never been terminated. She contends that Hartford is estopped to deny coverage because of knowledge brought to its attention and finally that the policy is incontestable.

The policy, as finally amended,[1] defined the classes of employees who were eligible for insurance as follows:

"All active full time employees as follows:
1. President
2. Controller, Managers, Supervisors and Sales Training Directors
3. Sales Personnel
4. Installers
5. All other employees"

Employees became eligible when they had completed one month of continuous service in an eligible class.

The various classes of employees were entitled to the following coverage:

Class 1 (President)—Basic Life—$12,500.00, Excess Life—$17,500.00
Class 2 (Controller, Managers, etc.)—Basic Life —$12,500.00, Excess Life —$12,500.00.
Class 3 (Sales Personnel) Basic Life—$12,500.00 Excess Life—$7500.00
Class 4 (Installers)—Basic Life—$12,500.00 Excess Life—$2500.00
Class 5 (All other employees)—Basic Life only —$10,000.00.

It is contended that decedent was the controller of Ever-Soft and thus entitled to $12,500.00 in basic life insurance and $12,500.00 in excess life insurance.

Active full time employees were defined as "employees who are *regularly employed* by the Policyholder in the usual course of the Policyholder's business and who work at least the number of hours per week established by the Policyholder *as the normal work week, but in no event less than 30 hours per week.*" (Italics supplied.)

The defendant denied that decedent was ever a full time, active employee of

---

1. The classes of employees were amended twice but we are concerned with the policy as it read at the time of decedent's death. The last change was effective May 4, 1966, at which time a class called "Class 2—Controller, Managers, Supervisors and Sales Training Directors" was added.

Ever-Soft and argued that he was therefore not covered by the policy. The defendant admitted however, that the plaintiff widow was designated as a beneficiary on a Group Insurance Enrollment Card completed by decedent and dated August 11, 1965, and that a certificate of insurance was issued to decedent.

The key to the first problem (whether decedent was a full time, active employee of Ever-Soft) appears to rest on the number of hours the decedent worked and whether he worked in the usual course of the employer's business.

The owner and manager of Ever-Soft, one Philip F. Straus (herein "Straus") incorporated Ever-Soft in May of 1961 to install water conditioning equipment. Straus and his family owned all of the corporate stock. Prior to May of 1961 Straus worked for another company where he had met Francis P. Hanrahan, an independent insurance agent who sold insurance for Hartford Life Insurance Company (herein Hartford). Straus, who was also an experienced man in insurance matters [2] wanted a group policy for the employees of Ever-Soft and requested Hanrahan to arrange for the policy. One of the reasons for arranging a group policy was that Straus knew that he himself was uninsurable and Hanrahan also knew of this fact. Hanrahan did write the group policy for Ever-Soft with the aid of John King, Hartford's group life zone agent.

Straus also wanted to install a pension plan and his attorney (James Bowman, Esq.) introduced Straus to decedent who was an independent accountant (uncertified) who had engaged in practice in preparing pension plans. Out of this introduction there grew a business relationship during which decedent wrote a pension plan for Ever-Soft, consulted with Straus on business matters and handled the tax returns of Ever-Soft. In the summer of 1965, Straus thought it necessary to restructure his personnel because of some dissatisfaction within the corporate organization and on July 15, 1965, the directors of Ever-Soft resolved to hire decedent at $12.00 per hour to advise the corporate officers and he was designated controller.[3]

On July 25, 1965, Straus suffered a heart attack and was disabled until November of 1965. He told decedent to take over and manage Ever-Soft. The decedent did so in an executive capacity until November 25, 1965, when Straus returned to assume control and decedent went back to his duties as controller.

As heretofore noted, decedent completed an enrollment card on August 11, 1965, applying for coverage as an employee [4] and the defendant company on September 28, 1965, wrote to Ever-Soft enclosing a certificate of insurance (Plaintiff's Exh. 4). The effective date of the certificate was August 15, 1965, provided full time, active service was effective. The letter enclosed the enrollment card which, it instructed should be attached to the Ever-Soft files.

2. Straus was licensed by the Commonwealth of Pennsylvania on September 30, 1958 to write individual and group life insurance and accident and health insurance.

The decedent was licensed by the Commonwealth of Pennsylvania to write individual and group life insurance on December 20, 1958.

The plaintiff widow is an uncertified accountant in her own right with her own practice.

3. The minutes (Exh. 3) show that decedent was retained at a temporary compensation of $12.00 per hour to make a study and recommendation on tentative budgets for departments, sales brochures and responsibility to be assigned employees. He was to keep a record of the hours spent.

4. The enrollment card (Exh. 9) showed decedent's occupation as "controller" and his salary as $800.00, but did not specify what period this covered, even though the form asked for the rate of pay per week, month or year. The form contained blanks which were to be completed indicating one's rate of pay. Decedent merely listed his pay as $800.00 and the other blanks were neglected. Thus, one reading his application would not really know his rate of pay.

Decedent was carried on the policy in Class 4 (covered for $4000.00) until July 4, 1966, when he was placed in Class 2.

Decedent was never paid a monthly salary until May of 1970, but instead kept a record of the hours he spent on the job [5] each month and periodically sent a bill for the hours spent at $12.00 per hour. On May 15, 1970, he was put on the payroll at $150.00 per month.

Decedent's tax return for 1965 shows that he was paid $3524.00 in 1965 by Ever-Soft. The payroll records were not available for 1965 in the office of Ever-Soft but payroll records for the following years show that in 1966 decedent was paid $7184.00 (about 600 hours at $12.00 per hour or about 11½ hours per week). In the years—

1967 — $5988.00
1968 — 3240.00
1969 — 1824.00
1970 — 900.00

During these years decedent worked at his own office for other people as a tax and pension consultant. He had incorporated himself and in addition to fees, he collected commissions from insurance companies which insured group plans of various kinds. He had an office separate from his home and spent long hours there at his work. In fact, almost all of his time was spent on his own practice.

The people who worked for Ever-Soft were designated for the various group life categories by Straus himself, who told Hanrahan of his designations. Hanrahan submitted the names to Hartford which then sent bills to Ever-Soft for premiums which were duly paid. Hanrahan went to Ever-Soft's office from time to time and obtained the records which Hartford requested. He administered the plan, in effect. For the month of July, 1966, decedent appeared in Class 2 and he remained there until his death

although decedent received no pay for the last quarter of 1969 and for the first four months in 1970, but he was paid $150.00 per month for the months of May, June, July, August, September and October of 1970.

Following the death of decedent the defendant company returned all premiums which Ever-Soft had paid to defendant for the policy on decedent's life and the check was cashed by Ever-Soft. The plaintiff widow, of course, was not offered any part of the refund.

The office manager for Ever-Soft from September 1, 1965, to October 30, 1970, Nancy Rodgers, computed decedent's pay checks based upon the hours decedent told her he had worked, (until 1970), and deducted from his checks social security withholding and income tax withholding as she customarily did with the other employees.

The group life plan was sold to Straus by Hanrahan and by Hartford's own zone manager of group sales, John King, who met with Straus at least twice to discuss the details of the plan.

The plaintiff contends that even if decedent was not eligible at his death, he had been eligible in 1965 when he was running the company and once he had been eligible and had met the requirements and was insured by the group policy he remained insured even though he had ceased working 30 hours per week.

The policy provided that coverage ceased on "(2) the date of termination of the insured's employment with the policyholder in the classes of individuals eligible for insurance. Cessation of active work by an insured shall be deemed to constitute termination of his employment, except that absence from work on account of (a) sickness or injury, or (b) for not longer than three months on account of leave of absence or temporary lay off shall not be deemed to constitute termination of employment, unless and until the policyholder shall either notify

5. These hours were not necessarily spent at the Ever-Soft office. Much of the work for Ever-Soft was done by phone from decedent's own office. There is no way of knowing how many hours he spent at the Ever-Soft office.

the company of the termination of the employment of such insured, based upon some plan which will preclude individual selection, or shall cease to make premium payments on account of the insurance hereunder of such insured."

There is no evidence that decedent ever took any time off because of illness nor that he was ever granted a leave of absence.

There was an incontestability clause in the policy which provided that after two years the policy could not be contested.[6]

The plaintiff argues, (1), that decedent was an active, eligible employee covered by the policy especially in the summer of 1965, (2) that even if he was not eligible at the time of his death he had been covered in 1965 and his coverage did not terminate, (3), but even if decedent was otherwise ineligible, the policy covered him by reason of notice to Hanrahan of his status and Hanrahan's relationship to Hartford, as a result of which Hartford is estopped to deny coverage or that Hartford had direct notice of enough to create estoppel and (4), even if there was no estoppel, the policy was incontestable under the circumstances. The defendant counters every argument.

No one could say during trial how many hours decedent worked per week during 1965 or between July 15, 1965, when the directors of Ever-Soft hired him, and November 25, 1965, when Straus returned to work after his heart attack, or between July 25, 1965, and November 25, 1965, when Straus was entirely absent. The plaintiff widow recalled calling decedent at Ever-Soft only twice and Straus called him there only occasionally after he was permitted to make phone calls. If we were to divide $12.00 into $3524.00 we would conclude

that decedent worked 294 hours for Ever-Soft in 1965. Between July 15, 1965, and November 25, 1965, when he was the chief executive, there were 19 weeks and if he worked at a steady pace he would have worked 15.5 hours per week.[7] Nor do we know how many hours per week he worked from August 11, 1965, when he was enrolled in the plan, until the end of the year. (The payroll records for 1965 were lost and never found). We know that because of the number of weeks remaining in the year he could not have complied with the 30 hour week requirement nor was he employed steadily for 30 hours per week in 1966, or thereafter. From the payroll records for 1966 and later years we can determine that his peak earnings took place during the last two weeks of June 1966 when he earned $498.00, so he was working 20 hours per week if he worked at a steady pace at the peak of his activity. Whether he worked all of the hours or most of them in a concentrated period is unknown.

■ We conclude that decedent never did meet the definition of an active, full time employee as it appeared in the policy and never having met that definition his eligibility never occurred and therefore was not terminated.

But what of the argument that Hartford had knowledge that should bring estoppel into play? Hartford had three pieces of information, it is argued, that put it on notice that it should make further inquiry and failing to make that inquiry it is estopped to deny coverage. Two pieces of the information went to Hartford directly. One piece of information went to Hanrahan, the general agent. It is argued that notice to him was notice to Hartford because he was an agent for Hartford.

---

6. Except for non-payment of premiums . . . . this policy shall be incontestable after two years from its effective date and . . . . no statement made by the individual insured relating to his insurability shall be used in contesting the validity of the insurance with respect to which such statement was made after

such insurance has been in force . . . . for a period of two years . . . . nor unless it is contained in a written application signed by him.

7. This assumes that all 294 hours were worked in the 19 weeks.

We have already described the first piece of information which Hartford received which, it is argued, should have alerted Hartford that something was wrong, i. e., the enrollment card where decedent did not disclose complete information about his wages.

The second was a letter sent to Hanrahan on November 11, 1965, by decedent enclosing an application seeking coverage on a separate group health and accident policy which Hanrahan was writing for Ever-Soft at that time. The letter was on a letterhead of R. P. Goodwin & Company, Inc., 3864 Baytree Street, Pittsburgh, Pa. 15214, showing the owner of the letterhead to be an independent professional man. It contained the designation "consultants pension-profit sharing-deferred compensation." The letter was signed "R. P. Goodwin" (Exh. 10). It is argued that Hanrahan was put on notice by the letter that Goodwin was not a full time employee of Ever-Soft.

Finally, a census of the employees of Ever-Soft was sent to Hartford on April 8, 1968, by Hanrahan who had obtained the census from Ever-Soft or who had prepared it himself. Hartford had requested the census which was on Hartford forms and, although the salary was shown in the appropriate column for every other employee (except Straus), there was no salary shown for decedent. It is argued that this put Hartford on notice that something was wrong, that Goodwin was not a full time, active employee, or that a combination of all the information put Hartford on notice that further inquiry was necessary.

Decedent did not qualify for the accident and health coverage because of previous surgery. Some medical investigation of decedent followed his application for the health coverage because on November 15, 1965, Hartford (acting through Bob Young of the Pittsburgh branch) wrote to Hanrahan asking for further clarification of the answer to question No. 10 on the application for the health and accident coverage. Question No. 10 asked whether any other insurance had been refused or cancelled and

decedent had answered "yes." On December 6, 1965, Hanrahan sent in an application containing additional information after he had obtained the forms through Bob Young which were to be used by decedent's physician to reveal the nature of decedent's condition.

It is unknown whether decedent was ever investigated (other than the inquiry into his health) although as late as March 18, 1968, the home office of Hartford was asking for the "entire duties" of certain other employees who were covered by the health and accident policy.

Of course, the home office saw the census forwarded by Hanrahan. It is unknown whether the home office ever saw the Goodwin letterhead.

The nature of the group life policy was such that any eligible employee was covered for life insurance whether insurable or not but the health and accident policy was more strictly supervised. One could not be covered by it unless he had good health, i. e., unless he was insurable.

Hanrahan operated an independent insurance agency but he acted as agent for Hartford in writing and servicing the policy. In fact, Ever-Soft was his largest, single customer.

Under these conditions was Hanrahan on notice that decedent was not an active employee? Was his knowledge imputed to Hartford? Did Hartford have sufficient direct notice to impose upon it the duty of further investigation?

In First Pennsylvania Banking and Trust Company v. United States Life Insurance Company, 421 F.2d 959 (3rd Cir. 1969) it was said that "in order to constitute waiver, there must be sufficient knowledge disclosed to the insurer that there is some falsity in the statement by the insured or something of some significance which would put a reasonably prudent person on notice to make further inquiry," so the questions boil down to whether Hartford was bound by what Hanrahan knew (as well as what its own employees knew) and whether there was some falsity in the statements made by the insured or something of some signi-

ficance which would put a reasonably prudent person on notice to make further inquiry.

In seeking aid to the answers to these questions one can find a vast number of cases on the general subject. As Judge Blandin said in Fisher v. Prudential Insurance Company, 107 N.H. 101, 218 A.2d 62, 26 A.L.R.3d 625 (1966):

> "This case poses familiar but nonetheless troublesome questions in the field of insurance law. It is difficult to explore even a small area of this subject without becoming lost in a maze of conflicting decisions and subtle distinctions. The battle between claimants determined to breach the stockade of coverage and insurers, equally determined to bar the gates, is the one feature which remains both constant and comprehensible."

■ We will first answer whether Hanrahan's knowledge was imputed to Hartford. We think that it was. It is agreed that he was a general agent who wrote policies for Hartford. The extent of his authority would be determined by common law rules of agency, Taylor v. Metropolitan Life Insurance Co., 106 N.H. 455, 214 A.2d 109; Fisher v. Prudential Insurance Company, *supra;* Caldwell v. Fire Association of Philadelphia, 177 Pa. 492, 35 A. 612 (1896); Appleman, Insurance Law and Practice, Vol. 16A, Section 9101. Although defense counsel in his excellent brief has cited Pennsylvania cases holding otherwise, we find that in this case where the agent supervised or administered the policy for Hartford his knowledge should be imputed to Hartford. This point is not decisive, however, because of Hartford's own knowledge.

Did Hartford have knowledge which was significant enough to put a reasonably prudent person on notice to make further inquiry? It had two independent pieces of information. The enrollment card (Exh. 9) which on its face left only one question unanswered which might arouse curiosity. Did $800.00 apply to the weekly or monthly or yearly salary? And the employee census almost three years later (Exh. 11), which listed every monthly salary save two, the President and the Controller. An alert employee would ask why there were omissions. Would a reasonably prudent person be put on notice, however, to make further inquiry? We think he would be put on notice, not perhaps by the enrollment card because one could assume that $800.-00 would be the monthly salary for a controller and perhaps not by the letterhead because it might be just an old letterhead which decedent was still using, but why would an employee census give the salaries for all the employees and omit the controller and would a reasonably prudent person then put two and two together and reason that the controller wasn't on the level and should be investigated?

How difficult would the investigation have been? Not difficult. Perhaps a phone call to Straus or a look at the payroll records or a phone call to Goodwin would have revealed the necessary information.

It depends on how one expects a reasonably prudent person to act. It would appear that the group policy was very loosely administered at the home office. Everything was directed to Hanrahan who serviced the policy. He only called on King when basic changes in the policy were needed and Hanrahan was, above all, a salesman. He concentrated on writing business. He wanted to cover people. He explained to Young at the home office in his memo of May 10, 1966, (Exh. 17) when he asked Young to get him certain forms "We have just written a group life case for this insured with an annual premium of in excess of $5000.00. I would appreciate anything you can do for me on this to expedite the issuance of a policy." He was trying to cover decedent with health and accident coverage and he revealed his concern to be of service to the customer. He was not seeking to narrow coverage but expand it. In his view the claims department could worry about coverage and, of course, this is one of the problems claims managers live with. The perplexing

problem is—how tough should the courts be in charging insurers with notice? To put it another way, how alert should we require their personnel to be? How much of the premium dollar should insurers be required to spend on policing the policies their agents so freely write? For five years Goodwin and Straus represented that Goodwin was an employee. In many respects he was, but both Straus and Goodwin knew that he was not regularly employed in the usual course of the employer's business and he was not working a normal work week and obviously he was not working 30 hours per week. They didn't exactly lie, they just didn't tell the whole truth. They left blanks where answers were required, but no one asked to have the blanks completed for five years and for five years Hartford depended on Hanrahan and made no independent audit. Only Goodwin's death brought the true facts to light. Do we charge Straus and Goodwin with this state of affairs or do we say that Hartford, if it had acted prudently, had long before the end of the five years been tipped off to the absence of eligibility?

■ What of decedent's good faith? Is the fact that he was a licensed insurance salesman so important as to impute to him bad faith in seeking coverage under the group policy and was he guilty of bad faith when he stated on the enrollment card that his salary was $800.00 for some undesignated period when he was really being paid $12.00 per hour. In order to apply estoppel in favor of an insured it is generally required that the insured shall have acted in good faith, see Appleman, Insurance Law and Practice, Vol. 16A, § 9081, et seq. (page 286), because estoppel is an equitable doctrine, essentially flexible and therefore to be applied or denied as equities between the parties may preponderate. (Section 9081 discusses waiver vis-a-vis estoppel).

On the other hand decedent did not try to hide his outside employment but revealed it having sent his Goodwin letterhead to Hanrahan. It is unknown who prepared the census which Hanrahan sent to Hartford omitting Goodwin's salary, but no one has contended that Goodwin prepared that document which was prepared under Hanrahan's direction or at least at his request because it is on Hartford's forms.

■ It would appear therefore, that Goodwin prepared the enrollment card, but revealed his outside employment and had nothing to do with preparing the ambiguous census. We find no bad faith on the basis of these facts sufficient to disqualify the plaintiff from claiming estoppel.

What had been held sufficient to put an insurer on notice so as to require further inquiry? In Williams v. Bankers Life Company, Tennessee Court of Appeals, 481 S.W.2d 386 (1971), it was held that mere knowledge of the insurer's agent that decedent was doing bookkeeping work for other clients was not sufficient to put insurer on notice that decedent was not a full time employee. However, in Love v. Metropolitan Life Insurance Co., 99 F.Supp. 641 (E.D.Pa. 1951) the court held that a jury question existed (whether the insured was put on notice) merely because insured had stated that he had undergone surgery but when asked for the names of physicians he had written "recovered" after which he had given the names of the hospitals where he had been treated. He had lied about treatment for a heart condition but had revealed other surgery, failing to disclose the identity of his doctors. It was held that a jury could consider the failure to answer to be such an ambiguity as to put the insurer on notice to make further inquiry.

In Phoenix Mutual Life Insurance Co. v. Raddin, 120 U.S. 183, 7 S.Ct. 500, 30 L.Ed. 644 (1887), it was held that where, upon the face of an application for life insurance, *a direct question appears to be not answered at all or to be imperfectly answered*, the issuance of the policy without further inquiry is a waiver

of the imperfection of the answer. (Italics supplied).

We are aware that group insurance has grown apace and that the insurance companies cannot afford to police each plan, but we are also aware that almost anyone can obtain coverage in one group or another, usually without any physical examination or investigation. We believe that had Hartford found that Goodwin was not regularly employed he would have and could have qualified himself by simply reporting for 30 hours of work per week at a reduced wage. Any regularly employed person was entitled to coverage. Of course, Hartford could have cancelled the entire group policy at any time if unsatisfied with Goodwin as an insured.

We find for the foregoing reasons that Hartford is estopped to deny the coverage set forth in the insured's certificate because an ambiguity was created in the entire course of dealing sufficient to put a reasonably prudent person on notice.

It is therefore unnecessary to reach the question of incontestability. Suffice it to say that First Pennsylvania Banking and Trust Co. v. United States Life Insurance Company, *supra,* states the rule presently in effect in Pennsylvania. We have found no Pennsylvania case on the point more recent.

The return of the premium and the cashing of the check by Ever-Soft does not bar recovery by decedent's widow.

This opinion will be considered to have set forth the findings of fact and conclusions of law required by Rule 52.

Judgment will be entered for the plaintiff for the face amount of the policy, the sum of $25,000.00 with interest. We do not decide at this time whether the premium may be deducted from the amount of the judgment or whether Ever-Soft must return the premium to Hartford.

It is so ordered.