**Edith P. GOODWIN, Plaintiff,**

v.

**HARTFORD LIFE INSURANCE COMPANY, Defendant.**

**Civ. A. No. 71–1070.**

United States District Court,
W. D. Pennsylvania.

June 1, 1973.

Stephen J. Laidhold, Pittsburgh, Pa., for plaintiff.

Edward Springer, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

McCUNE, District Judge.

Edith P. Goodwin brought this suit to recover the proceeds of a group life insurance policy which allegedly covered her deceased husband, Robert P. Goodwin. After a non jury trial we handed down an opinion and order on January 8, 1973, D.C., 352 F.Supp. 907, entering a judgment for the plaintiff for the face amount of the policy, $25,000.00, with interest.

Defendant, Hartford Life Insurance Company, has now filed a motion to amend or vacate judgment on three grounds. Except for the third ground, we do not think the motion raises new legal issues requiring extended discussion. It appears, instead, that it raises questions which in essence involve an interpretation of our previous opinion and order.

In our opinion we held, in short, that the doctrine of equitable estoppel applied so that Hartford could not avoid coverage after Goodwin's death.

I

Defendant now argues that the doctrine of equitable estoppel is inapplicable here because in our discussion of the evidence adduced at trial, we did not make a finding of fact that Mr. Goodwin acted in good faith. Hartford asserts that "unless the court makes a finding of good faith on the part of the plaintiff's decedent, and that he was in fact misled by the defendant's conduct,[1] it must enter judgment for the defendant." (Defendant's brief, p. 6.).

We were not unaware of defendant's position. As we observed in our opinion, "In order to apply estoppel in favor of an insured it is generally required that the insured shall have acted in good faith. . . ." (p. 16). We then held that on the basis of the facts we found no bad faith "sufficient to disqualify the plaintiff from claiming estoppel." (p. 16). Our choice of words on this point may have been misleading. To accurately reflect our thinking we should have said that we found *no proof of bad faith sufficient to disqualify the plaintiff from claiming equitable estoppel.* It is defendant's position that be-

---

1. We did not specifically discuss the reliance element in our previous opinion, but we think it is obvious. A man in his fifties who for five years had been led to believe he was covered by $25,000.00 worth of life insurance obviously has relied on that belief in planning for and arranging his estate.

cause we did not find good faith we cannot apply the doctrine of equitable estoppel. While it is true that an application of estoppel generally requires a finding of good faith, defendant overlooks the fact that it is also true, as we said in our opinion, that "estoppel is an equitable doctrine, essentially flexible and therefore to be applied or denied as equities between the parties may preponderate." (p. 16). Consequently we do not think it is a fixed and unalterable rule that a finding of good faith must *always* be made before the doctrine of equitable estoppel may be applied. Courts obviously have great flexibility in applying equitable doctrines and shaping equitable remedies. In equity each case must turn on its own facts. See, generally, 16A Appleman Insurance Law and Practice, § 9081, et seq., Elements of Waiver and Estoppel. For the reasons stated in our opinion we think the equities here lie with the plaintiff. Accordingly, we affirm our prior holding.[2]

## II

Defendant next contends that we erred in granting judgment to the plaintiff for the full amount of the policy. Instead, defendant argues, the award must be limited to $12,500.00, the amount due on the "basic insurance" contract. It appears that the "basic" coverage was supplemented by a $12,500.00 endorsement, or "excess" coverage.

Defendant contends that even though estopped from denying liability under the basic coverage, it is not estopped to deny coverage under the excess insurance because there were different qualifications for the two coverages. As we understand it, the basic coverage required that a person be an active full-time employee. The excess coverage required, in addition, that the insured not have missed work because of injury or sickness during the preceding thirty-day period.

Defendant has submitted to the court a letter from Lawrence J. Rupp, Vice President and Actuary of the Hartford Insurance Group, explaining this requirement:

"In the case of the group life insurance policy written by Hartford Life Insurance Company for the Ever-Soft Company of Pennsylvania, Inc., the excess insurance was added by an endorsement to the policy, dated May 4, 1966. As a result of the Thirty-Day Active Work Requirement, an employee of the Ever-Soft Company in order to be entitled to the excess in-

---

2. Hartford might contend that even if it could not prove bad faith it has made a showing of "unclean hands" and, therefore, plaintiff is not entitled to equitable relief. We do not think, however, that the record demonstrates that Mr. Goodwin acted in bad faith or that the plaintiff comes to court stained by any unclean hands.

First, Mr. Goodwin made no attempt to hide from Hartford his employment relationship with Ever-Soft. He wrote to Hartford on his own professional letterhead. It is true that he gave incomplete or ambiguous answers to some of Hartford's questions but, on the whole, we do not find that to be persuasive evidence of bad faith or unclean hands.

Second, we think it indicative of good faith that neither Mr. Strauss nor Mr. Goodwin made any attempt to hide the fact that their health made them uninsurable risks under non-group plans. Mr.

Strauss frankly told Hanrahan that he wanted group coverage for his employees because it was the only way he could get life insurance for himself. And Mr. Goodwin in applying for Hartford's Ever-Soft group accident and health coverage unequivocally told Hartford in filling out the application that his accident and health coverage had either been refused or cancelled.

We cannot find as a fact that Mr. Goodwin acted with unclean hands or in bad faith.

When faced with a choice between whether to cause forfeiture of the coverage because Mr. Goodwin gave ambiguous answers (alleged to have been made in bad faith) or whether to estop Hartford from denying liability when, after receiving adequate notice of possible irregularities, it did not police the group records for five years, we think equity demands we choose the latter.

surance, although insured for the basic amount, must again qualify as of May 6, 1966, (the earliest eligible date for such excess insurance) or on any date thereafter, as a person employed on a *full-time active basis*; who is physically able to perform all the duties of his regular occupation; and who has not been absent from active full-time work because of bodily injury or sickness during the immediately preceding thirty-day period." (Emphasis added).

We are unable to conclude from the record that Mr. Goodwin missed no work because of bodily injury or sickness during the 30 days immediately preceding the effective date of the rider, and therefore fulfilled the work requirements for excess coverage. In fact, we held in our earlier opinion that Mr. Goodwin did not meet even the lesser requirement for coverage under the basic policy.

The point, however, is not whether Mr. Goodwin qualified. It is that Hartford is estopped from arguing he did not qualify. We think it makes no difference whether defendant attempts to deny payment under either the basic or excess coverage. The estoppel applies to both. After having accepted Mr. Goodwin as an insured and continuing to insure him even after receiving information sufficient to put it on notice of his disqualification Hartford cannot come now and deny its liability in the absence of proof of bad faith. As we noted before, we did not find the defendant's proof of Goodwin's bad faith persuasive.

## III

Finally, Hartford contends that we erred as a matter of law in granting the plaintiff a $25,000.00 judgment because the maximum amount allowable under Pennsylvania law is $20,000.00.

The relevant statute in effect during the period of coverage now in dispute provided that no policy could exceed $20,000 or "one and one-half times the basic annual earned income of the employee, whichever is greater, but in no case exceeding forty thousand dollars ($40,000)." [3]

Hartford contends that since as a matter of record Mr. Goodwin's annual earnings from Ever-Soft were always less than $2,000 that the maximum amount of group life insurance ever permitted on Mr. Goodwin's life could not exceed the statutory limit of $20,000.

Plaintiff, on the other hand, contends that the language of the statute does not refer to the earnings from a single employer (i. e., Ever-Soft) but refers, instead, to Mr. Goodwin's annual earned income from all sources, including Ever-Soft and his private accounting practice. Plaintiff further contends that since Mr. Goodwin's tax returns for 1970, 1969, 1968, and 1967 introduced at trial demonstrated that his annual earned income for each of the years was over $20,000 he could recover in excess of $30,000 under the term of the statute. Therefore, according to their view, judgment for $25,000 was proper.

Any attempt to construe Pennsylvania statutes must be guided by the

3. 40 P.S. § 532.2(4)   Policies issued to employers or trustees of employer funds.

A policy issued to an employer, or to the trustees of a fund established by an employer, to insure employes of the employer for the benefit of persons other than the employer shall be subject to the following requirements:  . . .

(4) The amounts of insurance under the policy must be based upon some plan precluding individual selection either by the employes or by the employer or trustees.  No policy may be issued which provides term insurance on any employe which together with any other term insurance under any group life insurance policy or policies issued to the employers or any of them or to the trustees of a fund established in whole or in part by the employers or any of them exceeds twenty thousand dollars ($20,000) or one and one-half times the basic annual earned income of the employe, whichever is the greater, but in no case exceeding forty thousand dollars ($40,000).

provisions of the Statutory Construction Act, 46 P.S. § 501 et seq. Section 531 of the Act requires that the rules of construction set forth in the Act shall be observed unless their application "would result in a construction inconsistent with the manifest intent of the Legislature." It is the cardinal rule of statutory construction to ascertain and, if possible, give effect to the intention or purpose of the Legislature as expressed in the statute.[4] 34 P.L.E. Statutes § 121.

We have experienced great difficulty in discovering a purpose for the limitation set out in subsection (4). There is apparently no Legislative history to assist us in divining the Legislative intent in enacting 40 P.S. § 532.2(4), the provision in question. Nor does there appear to be any case law construing the section. With one unconvincing exception[5] counsel has not suggested any purpose the section could serve and we have been able to perceive none. Consequently, we turn as a source of evidence of Legislative intent to the Legislature's use of words in the statute. ·

█ The statute sets the policy limits on the basis of "basic annual earned income." Section 533 of the Statutory Construction Act (46 P.S. § 533) states that:

"Words and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this act, shall be construed according to such peculiar and appropriate meaning or definition.

General words shall be construed to take their meanings and be restricted by preceding particular words. 1937, May 28, P.L. 1019, art. III, § 33."

We do not think that "basic annual earned income" is a technical phrase. We have found no authority that it is a "term of art" in the insurance business which carries a specific meaning or is attended by subtle connotations. We think, therefore, the words must have been used in their common, popular sense and we will construe them in that light without giving special meaning to the phrase taken as a whole.

The crux of the problem here is the meaning of "income." According to Appleman, "income" is "gross income from all sources," as opposed to "earnings" which refers to the "fruits of labor or the price of services performed." 1 Appleman, Insurance Law and Practice § 301. The Internal Revenue Code defines "gross income" for federal tax purposes as all income from whatever source, with special exceptions. 26 U.S.C. § 61. The economists' definition of "income" is the money value of the net accretion in one's economic power between two points of time. Union Trust Co. of Pittsburgh v. Commissioner of Internal Revenue, 115 F.2d 86, 87 (3rd Cir. 1940). "Income" is broadly defined as the true increase in amount of wealth which comes to a person during a stated period of time. Commissioner of Corporations and Taxation v. Filoon, 310 Mass. 374, 38 N.E.2d 693, 700. For purposes of the Tennessee Workmen's Compensation Act, the word "income" is a broad, comprehensive and inclusive term and is generally defined as meaning "all that comes in." W. C. Sharp Drug Stores v. Hanbard, 176 Tenn. 595, 144 S.W.2d 777, 781. And Webster's Third New International Dictionary (unabridged) defines "income" as the "value of goods and services received by an individual in a given period of time." While it is apparent that the definition of "income" can have differing shades

---

4. Insurance statutes are not among the types of statutes listed in 46 P.S. § 558 which the Legislature specifically indicated should be strictly construed. Consequently the statute should be liberally construed to effect its object.

5. Defense counsel, in a one sentence contention, appears to argue that the limitation is intended to preserve the solvency and soundness of insurers. (Defendant's brief, p. 11). We do not find that theory persuasive.

of meaning,[6] it is also apparent that all these definitions, in essence, consider income as the total amount derived from all sources or revenue during a given time.

Based on an analysis of the common usage of the word "income" we think that by using the phrase "basic annual earned income" the Legislature must have intended that the policy limits be computed on the basis of the insured's total earned income from whatever source and not merely on the basis of the income received from any one employer who happened to be the contracting party on the group insurance plan.

 We think the statute analyzed from another perspective impels the same result. In doubtful cases a statute should be construed by considering the general course of legislative policy with regard to the matter, and the existing general or public policy of the state. 34 P.L.E. § 150, citing Fuellhart v. Blood, 7 Dist. 575, 21 Pa.C.C. 601, aff'd, 11 Pa. Super. 273 (1898).[7]

The Legislative trend as regards the statute on group insurance has been to increasingly liberalize the amount of coverage permitted under subsection (4). The statute was originally enacted in 1949. The "Historical Note" following the statute indicates that:

> "The amendment of 1953 added, after "twenty thousand dollars ($20,000)," the alternative provision "or one and one half times the basic annual earned income of the employee, whichever is greater, but in no case exceeding forty thousand dollars ($40,000)."

In 1972 the Legislature passed Act No. 53 which eliminated the limits altogether.

We think that this trend in addition to use of the word "income" is indicative of a Legislative policy to permit as broad and extensive coverage under group insurance as the contracting parties wish to agree to provide.

Here, Ever-Soft and Hartford contracted to cover Mr. Goodwin in the amount of $25,000. We do not think that the defendant can rely on § 532.-2(4) to argue that the contract can only be enforced, as a matter of law, to the extent of $20,000.

Accordingly, the decision in our opinion of January 8, 1973, shall be and hereby is affirmed.

It is so ordered.

---

6. For instance differences in whether income is net or gross increase in one's economic power during a given period.

7. In *Fuellhart* the trial judge in interpreting an ambiguous judgment lien statute observed that "the tendency of legislation in the Commonwealth for a centry having been to limit the duration of the lien of judgments, it cannot be presumed

that the legislature intended to create a lien in the nature of a judgment lien that should continue indefinitely." 11 Pa. Super., at 277.

8. Subsection (4) now reads: (4) "The amounts of insurance under the policy must be based upon some plan precluding individual selection either by the employer or trustees."